IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DWAINE MARCUS COLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07 C 1941 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| SGT. KIRK, SGT. UCHECK, LT. MERCADO, | ) | |
| SGT. DAVIS, OFFICER AUSTIN, and | ) | |
| SGT. NOVARRO, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Dwaine Marcus Coleman brought this action alleging violations of his Fourteenth Amendment due process rights, while he was a pretrial detainee at the Lake County Correctional Center ("LCCC"). The court previously dismissed most of the defendants and most of the counts. Pursuant to Fed. R. Civ. P. 56, defendants Lake County Sheriffs, Officer Kingsley Austin and Lt. Megan Mercado, have moved for summary judgment on the two remaining counts: Count VI against Officer Austin for engaging in an alleged pattern of "assault, harassment, and intimidating behavior" toward plaintiff in May 2007 and against Lt. Mercado for allegedly failing to investigate plaintiff's complaints of Officer Austin's alleged behavior; and Count IX against Lt. Mercado for placing plaintiff in the Administrative Segregation Unit ("ASU") without a due process hearing. Plaintiff has also moved for summary judgment on Count IX. For the reasons discussed below, the remaining defendants' motion for summary judgment on Counts VI and IX is granted, and plaintiff's motion for summary judgment on Count IX is denied.

# FACTS ESTABLISHED FROM THE RECORD[1]

During all relevant times plaintiff was a pretrial detainee at the Lake County Correctional Center. Plaintiff arrived at LCCC on January 2, 2007. Plaintiff was initially housed in the General Population unit, where he was freely mobile and could interact with 40 to 60 other General Population inmates. Upon entry to LCCC, all inmates are classified[2] and most inmates are initially assigned to a General Population pod. Other inmates are assigned to the Administrative Segregation Unit, where they are confined to their cells for 23 hours a day and are served their meals through chuckholes[3] in the cell doors. Inmates in ASU are allotted one hour out of their cell each day, during which they are free to talk with other inmates, exercise, shower, or use the phone. Inmates are assigned to ASU for one of three reasons: (1) disciplinary

---

[1] Unless otherwise noted, the following facts, taken from the parties' L.R. 56.1 statements and attached exhibits are not in dispute.

[2] LCCC employs a 4-tier classification system. Status 1 is reserved for inmates who require protective custody. Status 2 is reserved for "incorrigible" inmates who have "demonstrated an inability to live within the acceptable framework of inmate behavior" and an inability to "conform the rules of the facility". Status 3 is reserved for inmates who are an escape and security risk. Status 4 is reserved for inmates who "require closer supervision and the special attention of jail administration." A classification committee reviews each ASU inmate's status on a weekly basis, considering daily logs and other documentation of the inmate's activity and behavior to determine whether an inmate should remain as classified, be reclassified, or be released to the general population.

[3] The chuckhole is a 12 in. x 5 in. rectangular opening with a hinged metal door in ASU's cell doors. Jail staff use the chuckhole to deliver food trays and to hand-cuff inmates. The chuckhole door is locked/unlocked from the outside by jail staff.

reasons[4], (2) protective custody status, or (3) administrative reasons.[5] Inmates in ASU for disciplinary reasons have limited privileges and are denied access to the television, commissary, outdoor recreation, or out-of-pod activities. Other inmates in ASU "may" have access to various programs and services that include, but are not limited to education services, commissary services, library services, social services, counseling services, religious guidance, recreational programs, and telephone access.

On April 18, 2007, plaintiff received notice that he was accused of a major rule violation. This alleged rule violation came on the heels of a number of other violations plaintiff started to commit shortly after his arrival at LCCC.[6] On May 4, 2007, plaintiff pled guilty to major rule violations of Interfering with Staff Duties and Committing Any Act that Disrupts the Orderly Operation of the Facility. On May 7, LCCC's Disciplinary Committee sanctioned plaintiff to ASU until June 2, 2007 (the "out-date").

---

[4]Disciplinary hearings are provided for all inmates accused of committing a major rule violation, such as battery, threatening harm to others, insubordination, profanity, or tampering with the plumbing system. Inmates in ASU for disciplinary purposes receive a disciplinary hearing.

[5]Plaintiff asserts that, based on LCCC's Inmate Handbook, inmates can be assigned to ASU only if they have been found guilty of rule violations in a disciplinary hearing or if they need to be separated from other inmates for safety reasons. However, the Handbook also states that inmates who "display hostility, aggression, violence, an unwillingness to comply with the rules and regulations, or who pose a risk to department safety and security may be administratively segregated".

[6]In January 2007, plaintiff was confined to ASU for twenty days, after being found guilty of filing a false report, using profanity, interference with staff duties, and insubordination. In February 2007, plaintiff was again temporarily confined to ASU. In March 2007, Plaintiff received another fifteen days in ASU after being found guilty of interfering with staff duties, disruptive behavior, and referring to an officer by other name. In April, plaintiff received another fifteen days after being found guilty, once again, of interfering with staff duties.

On May 21, 2007, while plaintiff was still in ASU, LCCC's classification committee classified plaintiff as Status 2, based on reports of plaintiff's various rules infractions, reported verbal and physical threats of harm towards corrections officers, numerous disciplinary hearings, and various temporary detentions in ASU, none of which resulted in improved behavior. Plaintiff was notified of this status change via a letter signed by defendant Lt. Mercado, which stated that the change was "due to [plaintiff's] being disruptive and not complying with the rules and regulations administered by the Jail." The letter also stated that "failing to remove [plaintiff] from general population would present a danger to the staff, [plaintiff], or other inmates." As a result of this re-classification, plaintiff was not released from ASU on June 2, 2007.[7]

On May 12, 2007, food service to the inmates in ASU was delayed because an ASU inmate required medical attention. The delay caused the food to become cold, and many inmates complained. In a form of protest, plaintiff placed his arms out of his chuckhole preventing defendant, Officer Austin, from closing and securing the chuckhole door. Despite Officer Austin's requests, plaintiff refused to remove his arms from the chuckhole, demanded a warm meal, and expressed a desire to speak with Command officers about the situation. Officer Austin disregarded plaintiff's requests and waited, out of plaintiff's view, for plaintiff to remove his arms. After some time, Officer Austin thought plaintiff was removing his arms from the area and snuck up and closed the chuckhole. As plaintiff had not yet fully-removed his hands from the area, his thumb was caught when Officer Austin closed and secured the chuckhole door. Plaintiff's thumb was red and leaking a little blood. A nurse, who was making rounds in ASU

---

[7]The parties dispute the reason for plaintiff's ultimate release from ASU. Jennifer Witherspoon, the Chief of Corrections, testified that plaintiff was released from Status 2 and ASU because of a marked improvement in his behavior. Plaintiff asserts that he was removed from Status 2 and ASU because LCCC had changed its classification system.

around the time of plaintiff's injury, adequately treated plaintiff's thumb with a Band-Aid, antibiotic ointment, and Tylenol. She did not observe any signs or symptoms to indicate that plaintiff suffered a serious injury. Plaintiff did not seek any further medical treatment for his thumb, and his thumb has since completely healed. He does not experience any lingering pain or limitations.

On May 12, immediately following the thumb incident, plaintiff filed a grievance, reporting Officer Austin's conduct that caused his thumb injury. The grievance was forwarded to defendant Lt. Mercado, who informed plaintiff that the matter would be investigated. Lt. Mercado ordered an investigation and, pursuant to LCCC's rules, the investigating sergeant reported his findings to the commander who was on duty at the time. The sergeant interviewed Officer Austin and determined that Officer Austin was not at fault for plaintiff's injury.

Plaintiff filed a second grievance on May 20, reporting further, unspecified harassment by Officer Austin. Defendant Lt. Mercado took no action on this second grievance, as it did not appear to be valid.

## DISCUSSION

### I. Summary Judgment Standard

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of Am., Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). When considering cross-motions for summary judgment, the court must view the evidence in a light most favorable to the party opposing the motion under consideration. O'Regan v. Arbitration Forums, Inc., 246 F.3d 975,

983 (7th Cir. 2001). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Assocs., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

**II.      Count VI:  Fourteenth Amendment Claim Against Officer Austin and Lt. Mercado**

In Count VI of plaintiff's first amended complaint, plaintiff alleges that Officer Austin violated plaintiff's fourteenth amendment rights "to be free from unprovoked harassment by engaging in a pattern of assault, harassment, intimidation, and battery against [p]laintiff while [p]laintiff was housed in ASU". Plaintiff also alleged that Lt. Mercado violated plaintiff's fourteenth amendment rights by "failing to conduct an investigation and otherwise exhibiting indifference" to plaintiff's report of Officer Austin's actions. These allegations stem from the previously described chuckhole incident on May 12, 2007.

6

The due process clause of the Fourteenth Amendment protects pre-trial detainees from cruel and unusual punishment while in detention and "requires that the government 'provide humane conditions of confinement' and 'ensure that inmates receive adequate food, clothing, shelter, and medical care.'" Zentmyer v. Kendall County, Ill., 220 F.3d 805, 810 (7th Cir. 2000) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)); see also Henderson v. Sheahan, 196 F.3d 839, 844 n.2 (7th Cir. 1999). For a finding of a constitutional violation, a plaintiff must show: (1) that the alleged deprivation is objectively serious and (2) the corrections officer exhibited deliberate indifference to the inmate's health or safety. Farmer, 511 U.S. at 834; Zentmyer, 220 F.3d at 810.

The court first considers whether Officer Austin's conduct in closing the chuckhole door, which resulted in plaintiff's injury, was a violation of plaintiff's Fourteenth Amendment right to be free of cruel and unusual punishment. See Bublitz v. Coffey, 327 F.3d 485, 491 (7th Cir. 2003).[8] Officer Austin's conduct would amount to a constitutional violation if it resulted from deliberate indifference that reached a "conscience-shocking level," i.e., that the "conduct intended to injure in some way unjustifiable by any government interest." Carlson v. Bukovic, No. 07 C06, 2008 WL 2397682, at *11 (N.D. Ill. June 9, 2008) (internal citations omitted). Deliberate indifference can exist only where actual deliberation by a defendant was possible. Bublitz, 327 F.3d at 490. As the Seventh Circuit duly noted in Bublitz, "[b]ecause the due process clause was not meant to serve as a 'font of tort law to be superimposed upon whatever systems may already be administered by the States,' only those governmental actions which involve substantial culpability are actionable under

---

[8]Negligence or gross negligence falls below the threshold required for a constitutional violation. See Bublitz, 327 F.3d at 491; see also Rapier v. Harris, 172 F.3d 999, 1006 (7th Cir. 1999) (citing Salazar v. City of Chicago, 940 F.2d 233, 238 (7th Cir. 1991)).

the Fourteenth Amendment." 327 F.3d at 490 (quoting Paul v. Davis, 424 U.S. 693, 701 (1976)).

In the instant case, the record is replete with evidence as to how Officer Austin waited until an appropriate time to close the chuckhole door. Based on deposition testimony from both plaintiff and Officer Austin, it is clear that Officer Austin waited at least until plaintiff was removing his arms and hands from the chuckhole door before he quickly closed it. Based on this evidence, even weighing it in a light most favorable to the non-moving party (plaintiff, in this instant motion), plaintiff has not demonstrated that Officer Austin acted with indifference to Plaintiff's safety, much less that Officer Austin's conduct shocks the conscience. Though plaintiff has been injured as a result of Officer Austin's actions, the claim does not amount to a constitutional violation.

In a final attempt to save Count VI from summary judgment, plaintiff draws the court's attention to the principle that "evaluations of motive and intent are generally inappropriate" when considering a motion for summary judgment. That principle is inapplicable here, as the court is not evaluating whether Officer Austin acted with a particular intent. Rather, the court is evaluating what evidence has been presented in support of plaintiff's contention that Officer Austin acted recklessly or with deliberate indifference. Beyond conclusory allegations, plaintiff has not presented any supporting evidence. Therefore, conclusory allegations alone cannot survive a motion for summary judgment. See Ashcroft v. Iqbal, No. 07-1015, 2009 WL 1361536, at *2 (May 18, 2009) ("[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations").

The court next considers whether Officer Austin's denial of plaintiff's request for medical treatment was a violation of plaintiff's constitutional rights. The court must first consider whether

8

plaintiff has shown that his thumb injury was objectively serious. "An objectively serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention.'" Zentmyer, 220 F.3d at 810 (quoting Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997)). In the instance case, the record clearly establishes that plaintiff's injury was not objectively serious. The record contains only one reference to the thumb injury being serious -- plaintiff's deposition testimony that he suffered "severe pain" when the chuckhole closed on his thumb. At the same time, plaintiff acknowledges that his thumb needed minimal medical attention; a nurse was able to treat his injury with a mere Band-Aid and antibiotic ointment. Further, plaintiff needed only Tylenol to manage the pain, and he was able to move his thumb immediately after and since the incident. Since the incident, his thumb has not required any further medical attention.

Based on these facts and the record before the court, no reasonable jury could find that plaintiff's thumb injury was objectively serious. Plaintiff's evidence to the contrary is objectively insufficient. Further, plaintiff's evidence of feeling "pain" is subjective, not objective. Because plaintiff has presented no evidence that meets at least the first prong of the aforementioned two-part test, the court need not consider whether Officer Austin exhibited deliberate indifference to plaintiff's health and safety when he denied plaintiff's request for medical treatment. Consequently, Officer Austin's denial of plaintiff's request for medical treatment was not a violation of plaintiff's constitutional rights.

Turning to Lt. Mercado, plaintiff alleges that Lt. Mercado violated plaintiff's fourteenth amendment rights by "failing to conduct an investigation and otherwise exhibiting indifference" to plaintiff's report of Officer Austin's actions and "further assaults and harassment". A review of the

9

parties' Local Rule 56.1 Statement of Undisputed Facts reveals the following: Lt. Mercardo ordered an investigation concerning plaintiff's thumb incident upon receipt of plaintiff's grievance; an investigation was performed and Officer Austin was interviewed; and the investigation revealed that Officer Austin was not at fault. Based on the foregoing, plaintiff has not shown how Lt. Mercado exhibited indifference to plaintiff's injuries. As for Lt. Mercado's alleged failure to investigate plaintiff's grievance concerning "further assaults and harassment by Officer Austin," the record is bereft of facts evidencing such harassing cconduct by Officer Austin. In the absence of such supporting facts, plaintiff has failed to show how Lt. Mercado's conduct amounts to a constitutional violation.

Accordingly, defendants' motion for summary judgment is granted on Count VI.

### III. Count IX: Due Process Claim Against Lt. Mercado

In Count IX of plaintiff's first amended complaint, plaintiff asserts that defendant Lt. Mercado is liable under 42 U.S.C. § 1983 for violating his Fourteenth Amendment right to due process by "imposing [the Status 2] classification upon [him] and subjecting [him] to punishment and further restrictions without affording [him] an opportunity to be heard, call witnesses, or be present at a hearing." Plaintiff contends that his continued segregation in ASU beyond his out-date was for disciplinary, not administrative, purposes, for one of two reasons. First, plaintiff contends that pursuant to LCCC's handbook there are only two reasons why inmates are assigned to ASU: (a) for disciplinary detention or (b) for protective custody. Because plaintiff was classified as Status 2 due to "[his] being disruptive and not complying with the rules and regulations administered by the Jail" and "his inability to follow rules," plaintiff concludes that his continued segregation must have been for disciplinary purposes. Plaintiff also contends that the Status 2 designation, intended

10

for "incorrigible" inmates who "will not conform to the rules of the facility," reflects that the Classifications Committee did not segregate him for security reasons. Second, plaintiff contends that he was deprived of television, commissary, and out-of-pod privileges during his extended segregation, the same privileges of which he was deprived during his initial disciplinary segregation. Plaintiff reasons that this continued deprivation of privileges demonstrates that his extended segregation was for disciplinary purposes.[9]

In concluding that his continued segregation was for punitive purposes, plaintiff contends that he was deprived of a liberty interest without due process of law; that as a pretrial detainee he had a right to procedural protections receiving the Status 2 classification. Plaintiff cites to Mitchell v. Dupnik, 75 F.3d 517, 524 (9th Cir. 1996), for this principle.[10]  Plaintiff also cites to Love v.

---

[9]Plaintiff offers an alternative and unusual argument in support of his claim that his continued segregation was unconstitutional. Plaintiff contends that, even if his continued segregation was for his prior rule violations, it still amounted to punishment, and the Classification Committee exceeded its authority when it unilaterally changed his status and kept him segregated. However, plaintiff fails to note that, pursuant to the Classification Committee's Policy and Procedure Manual, the Committee does have the authority to "review administrative segregation inmates" and to "determine if the need to continue segregation still exists." Plaintiff is correct that the Committee does not have the authority to hold disciplinary hearings. The Committee does not need to hold a disciplinary hearing to render its decision. Its decision is based on a review of records pertaining to the inmate's behavior, including records from disciplinary hearings held by LCCC's Disciplinary Committee. Further, plaintiff argues that the Classification Committee "violated its own rules and thus magnified the unconstitutional action against Plaintiff" by causing plaintiff to be segregated for a total of 70 days, more than 24 days beyond the maximum 60 days permitted for punitive segregation. However, because the record clearly establishes that plaintiff's continued segregation was for administrative, not punitive, purposes, this argument is irrelevant.

[10]Plaintiff also cites to Mitchell, at 524, n.4, and Love v. Sheahan, 156 F. Supp. 2d 749, 755-56 (N.D. Ill. 2001), for the principle that a hearing was necessary to ensure that plaintiff's continued segregation was indeed for administrative, rather than punitive, purposes. However, plaintiff's interpretation of those cases is off the mark. Those cases concerned the segregation of a pretrial detainee after an alleged rule infraction. Accordingly, the Mitchell and Love courts note the importance of holding hearings to ensure that the segregation for rule infractions are

(continued...)

11

Sheahan, 156 F. Supp. 2d 749, 755-56 (N.D. Ill. 2001), for the principle that a pretrial detainee may not be segregated "to protect the safety of jail staff, other inmates, or the pretrial detainee" without a hearing.

Defendant contends that no genuine issue of material fact exists as to the reason for plaintiff's extended segregation in ASU, namely that plaintiff remained in ASU to "ensure the smooth and orderly operation of the jail." Because plaintiff's continued segregation was for administrative purposes, defendant contends that plaintiff was not entitled to a notice or a hearing, pursuant to the Seventh Circuit precedent. Higgs v. Carter, 285 F.3d 437 (7th Cir. 2002); Zarnes v. Rhodes, 64 F.3d 285 (7th Cir. 1995).

For the foregoing reasons, the court agrees that no genuine issue of material fact exists as to the reasons for plaintiff's extended segregation and concludes that plaintiff's due process rights were not violated by his continued segregation in ASU. An additional hearing for classification purposes would have been redundant and unnecessary. Plaintiff was classified Status 2 upon LCCC's review of disciplinary hearing records concerning plaintiff's prior rule violations and notations of other purported infractions. Thus, another hearing to once again review the established record of confirmed rule violations would do nothing to further protect plaintiff's constitutional rights.

In the watershed case concerning restrictions on pre-trial detainees, Bell v. Wolfish, 441 U.S. 520, 540 (1979), the Supreme Court recognized the importance of allowing the government to take steps to maintain security and order at correction facilities. "Absent a showing of an expressed

---

[10](...continued)
what corrections facilities purport them to be. Neither case discussed the segregation of an inmate for administrative purposes, much less segregation of an inmate who has been found guilty of numerous rule violations at several disciplinary hearings.

intent to punish on the part of detention facility officials," courts must consider whether the imposed restraints are "reasonably related to the institution's interest in maintaining jail security" and "ensuring the effective management of the detention facility". Id. at 539-40. Even if the restraints are "discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial," they are not means of presumptively unconstitutional punishment. Id. Further, the Bell decision cautioned courts to give deference to the expert judgment of corrections officials "in the absence of substantial evidence to indicate that the [officials' response was exaggerated]," arbitrary, or purposeless. Id. at 539, 540, n.23. The Seventh Circuit followed suit and upheld restraints placed on pre-trial detainees where such restraints were for administrative, rather than punitive, purposes. See e.g., Zarnes v. Rhodes, 64 F.3d 285, 291-2 (7th Cir. 1995) (affirming summary judgment for defendant on due process claim in absence of evidence that pre-trial detainee was segregated as either punishment for the crime she allegedly committed or for her misconduct in detention, or that her segregation was arbitrary); Higgs v. Carter, 285 F.3d 437 (7th Cir. 2002) (recognizing that 34-day segregation of pre-trial detainee who threatened other inmates and staff could have been for administrative purposes).

In considering plaintiff's motion for summary judgment on Count IX, the court will first view the facts in a light most favorable to the non-movant, here, defendants. Plaintiff's inability to adhere to LCCC's rules is evident in the record and is uncontested. The parties do not dispute that plaintiff was sent to ASU on a number of occasions (prior to the occasion in dispute) for disciplinary purposes, was given disciplinary hearings for his rule violations, and was found guilty of at least one jail rule infraction at each of his disciplinary hearings. The Classification Committee decided to classify plaintiff as Status 2 after it reviewed reports detailing plaintiff's misconduct and disruption

13

of the jail's operation and plaintiff's failure to positively modify his behavior during his previous detentions in ASU. Corrections Chief Jennifer Witherspoon released plaintiff from Status 2 and confinement in ASU after witnessing a marked improvement in plaintiff's behavior.

In addition to evidence concerning plaintiff's inability to abide by LCCC's rules, the record also contains evidence that LCCC inmates are not segregated to ASU for arbitrary reasons. The LCCC Handbook specifically states that "[i]nmates are assigned to the administrative segregation unit when it becomes necessary to keep them separated from general population." Specifically, inmates who are given disciplinary detention status or protective custody status will be placed in ASU. Inmates who "display hostility, aggression, violence, an unwillingness to comply with the rules and regulations, or who pose a risk to department safety and security may [also be placed in ASU]." Plaintiff has presented no evidence that segregation in ASU for an additional forty days was excessive, arbitrary, or purposeless. Plaintiff has also not alleged that any of his disciplinary hearings that resulted in temporary ASU segregation were inadequate; plaintiff was confronted with the charges and evidence against him and allowed to speak in his own defense. Thus, no reasonable jury could conclude that plaintiff's continued segregation was not for administrative purposes.

In considering defendant's motion for summary judgment on Count IX, the court now views the evidence in a light most favorable to plaintiff. Again, plaintiff has presented no evidence that his continued segregation was for punitive, rather than administrative purposes. Although plaintiff contends that his extended segregation amounted to punishment, in part because he continued to be denied certain privileges, the LCCC handbook shows that access to those privileges is not guaranteed for inmates in ASU for non-disciplinary reasons. ("Inmates in protective custody and

14

inmates housed in ASU who have not had a disciplinary hearing, <u>may</u> have access…") (emphasis added). A reasonable jury could not conclude that plaintiff's continued segregation was for punitive purposes. Thus, defendant Lt. Mercado did not violate plaintiff's constitutional rights by continuing plaintiff's segregation in ASU without a separate hearing.

For the foregoing reasons, defendants' motion for summary judgment on Count IX is granted; plaintiff's motion for summary judgment on Count IX is denied.

## CONCLUSION

For the reasons stated above, the court grants defendants' motion for summary judgment on Counts VI and IX and denies plaintiff's motion for summary judgment on Count IX.[11]

**ENTER:** **June 10, 2009**

_____
**Robert W. Gettleman**
**United States District Judge**

---

[11] The court expresses its gratitude to plaintiff's attorneys, William E. Meyer, Jr. and David T. Morris, of Schiff Hardin LLP, for serving as court-appointed counsel, and appreciates their time and effort in advocating on behalf of their client.

15